# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

BRANDON WILLIAM CARRIER,

Defendant-Appellee.

FOR PUBLICATION
January 27, 2015
9:00 a.m.

No. 322020
Bay Circuit Court
LC No. 13-010577-FH

Before: MURPHY, P.J., and METER and SERVITTO, JJ.

MURPHY, P.J.

Defendant was charged with one count of threat of terrorism, MCL 750.543m, and one count of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. In support of the threat-of-terrorism charge, the prosecution relied, in part, on phone communications between defendant and an emergency services specialist while the specialist was manning a mental health crisis hot-line. After the 80-minute call was concluded, the emergency services specialist contacted 911 and reported specific threats that defendant had made during the crisis hot-line call. Defendant argued that his conversation with the emergency services specialist and the related 911 recording concerned privileged communications and were thus inadmissible in the criminal case brought against him. The district court bound defendant over on the two charges following the preliminary examination, declining to address the privilege issue, as it found that other unchallenged evidence existed that adequately established the probable cause threshold. Subsequently, the circuit court ruled that defendant's statements and threats that were conveyed to the emergency services specialist during the crisis hot-line call constituted privileged communications, absent any waiver of the privilege. Accordingly, the circuit court granted defendant's motion to exclude the testimony of the specialist and the associated 911 recording, but the court denied defendant's accompanying motion to quash the information. The prosecutor then filed an application for leave to appeal, challenging the circuit court's evidentiary ruling and arguing that the doctrine of privilege did not require exclusion of the evidence. The application was granted by this Court. *People v Carrier*, unpublished order of the Court of Appeals, entered July 29, 2014 (Docket No. 322020). We now hold that although defendant's communications were generally privileged, the privilege was effectively waived or lost to the extent that defendant voiced threats of physical violence against reasonably identifiable third persons as to whom he had the apparent intent and ability to carry out the threats in the foreseeable future, MCL 330.1946(1). We therefore reverse and remand.

-1-

## I. FACTS

At the preliminary examination, Jason Felber testified that on August 13, 2013, he went with defendant to a local bar and had a couple of drinks. Felber indicated that they left the bar well after midnight and then went to Felber's house and consumed more alcohol. According to Felber, defendant thereafter became upset and started threatening to harm people. Felber testified that defendant threatened to put defendant's girlfriend in a wood chipper and to kill Deputy Tony Peter of the Bay County Sheriff's Department, as well as Peter's family. Felber then asked defendant to leave and called 911 to report his concerns about defendant's threats.

Christian Ginther, an emergency services specialist at Bay Arenac Behavioral Health, testified at the preliminary examination that his job involved answering the mental health crisis hot-line. As part of his employment, and when not answering the crisis hot-line phones, Ginther also "perform[ed] mental health evaluations on . . . individuals presenting for hospitalization." Ginther testified that he was qualified to perform these tasks because he had a bachelor's degree in social work. He also indicated that he was ten months away from completing a master's degree in social work. More testimony regarding Ginther's credentials was elicited at the subsequent circuit court hearing on defendant's motion to exclude the challenged evidence and to quash the information. At that motion hearing, Kristy Moore took the stand and testified that, at the time of the incident, she was employed by Bay Arenac Behavioral Health and managed the clinical services program. Moore stated that she had a master's degree in social work and was a licensed social worker. Moore supervised Ginther, and she testified that Ginther's licensing status when he received the call from defendant was as follows, "Limited license, Bachelor of social work." Moore then discussed differences between limited and full licenses with respect to social work and counseling. She agreed with the prosecutor's characterization that a "limited license is kind of a temporary measure where you've got to obtain the full license." Moore testified that Ginther was not a licensed physician, a licensed psychologist, a registered professional nurse, a master's licensed social worker, a licensed professional counselor, nor a marriage or family therapist. We shall examine below additional testimony from Moore on other matters.

Returning to Ginther's testimony at the preliminary examination, he indicated that defendant called the crisis hot-line around 3:00 a.m. on August 14, 2013, and that he was on the phone with defendant for about 80 minutes. Ginther testified that defendant requested to speak with "Vanessa" from Crossroads who had told him to contact the hot-line if he needed help after hours.[1] Defendant had seen Vanessa within the past day to address certain issues. The record

---

[1] Ginther testified that Crossroads was an outpatient facility that provided services for indigent consumers who lacked insurance to cover mental health treatment. With respect to defendant and his treatment at Crossroads, Moore explained that Crossroads was a "contract agency" and that defendant had been sent to Crossroads through her department at Bay Arenac Behavioral Health. Moore testified that therapists at Crossroads were instructed to give patients the contact information for the mental health crisis hot-line so that patients could call after hours if a crisis arose.

was never developed so as to identify Vanessa's last name, title, educational background, or her licensing status.

Ginther next testified with respect to the substance of his conversation with defendant during the crisis hot-line call, noting that defendant started off polite and agreeable but became more frustrated and angry toward the end of the conversation. We shall limit our discussion of the statements made by defendant to Ginther to those related to threats of physical violence against identifiable third persons. Ginther testified that defendant was very upset about an ex-girlfriend and stated that he could see her down the scope of his gun. When Ginther told defendant, "you said you're at home, I know you don't see her through your gun," defendant proceeded to list the types of guns that he had in his possession and expressed that he had ammunition. According to Ginther, defendant told him to call the police. Defendant threatened that he was "locked and loaded," waiting for the "first badge" to arrive. Ginther testified that toward the end of the conversation, defendant was making comments about people being outside of his house and was becoming increasingly agitated. Ginther indicated that after he heard a loud bang, defendant stopped talking for a moment and it seemed as if defendant had gone outside to check something, but defendant did eventually return to the phone. Other testimony detailed below established that the police had arrived at defendant's home in response to Felber's 911 call. Ginther claimed that he never told defendant that he was going to call the police or 911. Ginther quickly ended the conversation when defendant threatened Ginther, stating, "I'm gonna come up to the hospital, I know where you work, I know where that office is, I'm gonna shoot you, I'm gonna shoot your wife and your kids."

Ginther testified that after he hung up the phone, he immediately called 911 for the following reason:

> [A]nytime a person is expressing suicidal or homicidal allegations we go over in their HIPAA[2] rights with them that those are things that we're not privileged to keep secret, that we have a mandated duty to report.[3] . . . I had a duty to call 9-1-1 if only to do a safety check on him to make sure that he was doing all right. I wasn't calling 9-1-1 to get him trouble, I was calling 9-1-1 to make sure that he was all right because he had been drinking and he had been claiming that he had guns in his possession and he was expressing thoughts of wanting to hurt other people.

Sergeant Michael Shore, a shift commander at the Bay County Sheriff's Office, testified that at 3:41 a.m. on August 14, 2013, he received a call from the 911 dispatcher. Shore

---

[2] HIPAA is an acronym for the Health Insurance Portability and Accountability Act, 42 USC 1320d *et seq.*

[3] Ginther testified on cross-examination that he did not go over HIPAA rules with defendant, but he was sure that those rules would have been provided to defendant as part of entering into services with Crossroads. However, Ginther conceded that he had no direct knowledge that Crossroads went over HIPAA rules with defendant.

explained that the dispatcher "had informed me they . . . received a phone call from [Felber] and he stated a friend had just left his house agitated and had made threats towards the police." Shore indicated that he was provided information that defendant had consumed alcohol, was agitated, had made direct threats against Deputy Peter, and that defendant possibly had weapons in his residence. Shore testified that he notified other deputies on duty and that they all proceeded to defendant's home. Shore explained that he and the other deputies parked several blocks away from defendant's residence and approached the house undetected. Shore asserted that he overheard defendant talking on his phone through a kitchen window that was open. According to Shore, at one point he heard a door on the side of the garage open and someone walk out of the residence. Shore could not see whether it was defendant. Shore testified that afterward, defendant's phone conversation resumed. He overheard defendant saying, "I'm locked and loaded, I'm waiting for the first badge I see." Shore further testified that he also heard defendant ranting that "he was in the Michigan Militia and we don't know who we're fuckin' with." Shore stated that, upon hearing this remark, he and the deputies decided to pull back. Shore then contacted the Michigan State Police's Emergency Services Team (EST) to come in and handle the matter.

Shore testified that when he returned to the scene after obtaining a search warrant for defendant's home, the EST had already arrived. The EST detonated two flash grenades and directed defendant to exit the house. Shore indicated that defendant eventually surrendered and was taken into custody. Upon entry into defendant's residence, police located a .270 semi-automatic rifle and a .22 semi-automatic rifle.

As indicated earlier, Kristy Moore, the clinical services program manager who supervised Ginther, testified at the hearing on defendant's motion to exclude Ginther's testimony and the 911 recording and to quash the information. Moore testified that her department provided after-hours emergency services and pre-screening. According to Moore, five psychiatrists worked in the department and were supervised by a medical director. Regarding the crisis hot-line, Moore explained:

> If someone is in crisis, we try to help determine what level they're at, first of all, [so] we can calm them down. And we try to help them problem-solve. We talk about coping skills. If we think that they're in extreme crisis and they need to be hospitalized, we will encourage them to come in to be screened. Sometimes, people call in and really sound like they could need extra help, and we will . . . encourage them to enter services. And, if they give us permission, we can refer them on to our Access Department. So, it's kind of a point of entry as well.

Moore indicated that her crisis hot-line workers did not diagnose mental health disorders over the phone, given that it was a complicated process and generally done face-to-face. When asked if crisis hot-line workers provided any treatment, Moore responded, "we are helping people, we're assisting people. Some people use it as part of their treatment." Moore testified that crisis hot-line workers did not provide any psychotherapy or counseling to callers. When Moore was queried whether it would be fair to say that Ginther had collected information on defendant for use by people who diagnose and treat patients, Moore responded, "Yes."

Moore additionally testified that the crisis hot-line workers were under the supervision of a clinician – herself – and that after workers talked to callers, she would typically review the workers' notes and related paperwork. Ginther had previously testified that he took notes during his conversation with defendant, but he had not turned those notes over to the police because, in his view, they were privileged. Moore testified that Ginther phoned her at home after he had called 911 because it was the protocol that "any time we have to call 9-1-1 for a duty to warn, . . . we immediately call the supervisor in case we feel any other action is necessary." Moore stated that she reviewed Ginther's documentation concerning the incident and determined that he had properly and professionally handled the situation.

Defendant was arrested and charged with one count of threat of terrorism, MCL 750.543m,[4] and one count of felony-firearm, MCL 750.227b. As reflected earlier in this opinion, the circuit court subsequently granted defendant's motion to exclude the challenged evidence on the basis of privilege, finding that Ginther was a "paraprofessional" who collected information for the purpose of assisting the "treater" in making a mental-health diagnosis and providing treatment. The court ruled that although Ginther was not a licensed psychologist or counselor, he had been acting in a role meant to gather information that was then made part of defendant's file and utilized by licensed professionals in formulating a treatment plan for defendant's care. On this basis, the circuit court determined that defendant's statements to Ginther were protected by the psychiatrist-patient privilege. The court ruled that defendant had effectively asserted the privilege and, accordingly, Ginther would not be allowed to testify at trial regarding his crisis hot-line conversation with defendant.

The circuit court rejected the prosecution's argument that, under MCL 330.1946, defendant lost or waived the protection of any assumed privilege when he made violent threats.

---

[4] MCL 750.543m(1)(a) provides, in relevant part, that "[a] person is guilty of making a terrorist threat . . . if the person . . . [t]hreatens to commit an act of terrorism and communicates the threat to any other person." MCL 750.543b(a) defines an "act of terrorism," providing:

> "Act of terrorism" means a willful and deliberate act that is all of the following:
>
> (*i*) An act that would be a violent felony under the laws of this state, whether or not committed in this state.
>
> (*ii*) An act that the person knows or has reason to know is dangerous to human life.
>
> (*iii*) An act that is intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion.

The court agreed that the statute gave rise to a duty to warn under the circumstances. This duty, according to the circuit court, carved out an exception to the privilege, but nothing in the statute indicated that the privilege would be lost for other purposes after Ginther fulfilled his duty to warn by calling 911 and reporting the threats. The circuit court found, therefore, that the 911 recording and Ginther's testimony about the conversation with defendant were inadmissible. The court further ruled that, contrary to the prosecution's assertion, defendant did not waive the privilege when he conducted the phone conversation with Ginther in a manner that allowed Sergeant Shore to overhear the conversation. The circuit court explained, "I don't think that, at this hour of the evening standing on your porch, you would expect necessarily to have a police officer that close. So, I don't think that he didn't take precautions that were necessary." The court, however, did determine that the police could testify as to what they overheard, considering that Felber had earlier called 911 to indicate his concerns and that such was the reason the police were present at defendant's home, which presence was entirely proper. The circuit court denied defendant's motion to quash the information in light of the untainted evidence that supported the charges, including Felber's testimony.

The prosecutor appealed the circuit court's decision to exclude the evidence on the basis of privilege.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

With respect to a trial court's ruling regarding, in general, the admissibility of evidence, our Supreme Court in *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999), observed:

> The decision whether to admit evidence is within the trial court's discretion; this Court only reverses such decisions where there is an abuse of discretion. However, decisions regarding the admission of evidence frequently involve preliminary questions of law, e.g., whether a rule of evidence or statute precludes admissibility of the evidence. This Court reviews questions of law de novo. Accordingly, when such preliminary questions of law are at issue, it must be borne in mind that it is an abuse of discretion to admit evidence that is inadmissible as a matter of law. [Citations omitted.]

The interpretation and application of a privilege constitute legal questions that are subject to de novo review. *Meier v Awaad*, 299 Mich App 655, 663; 838 NW2d 146 (2013).

### B. PRINCIPLES OF STATUTORY CONSTRUCTION

This appeal requires examination and interpretation of various statutory provisions. "When interpreting a statute, we follow the established rules of statutory construction, the foremost of which is to discern and give effect to the intent of the Legislature." *Whitman v City of Burton*, 493 Mich 303, 311; 831 NW2d 223 (2013). "'The first step when interpreting a statute is to examine its plain language, which provides the most reliable evidence of [legislative] intent.'" *People v McKinley*, 496 Mich 410, 415; 852 NW2d 770 (2014), quoting *Ter Beek v City of Wyoming*, 495 Mich 1, 8; 846 NW2d 531 (2014). "If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is

permitted." *Whitman*, 493 Mich at 311. When an ambiguity does indeed exist, we may "go beyond the statutory text to ascertain legislative intent." *Id.* at 312. "Effect should be given to every phrase, clause, and word in the statute and, whenever possible, no word should be treated as surplusage or rendered nugatory." *Id.* at 311-312.

With respect to the construction of statutory privileges, our Supreme Court in *People v Stanaway*, 446 Mich 643, 658; 521 NW2d 557 (1994), stated:

> Unlike other evidentiary rules that exclude evidence because it is potentially unreliable, privilege statutes shield potentially reliable evidence in an attempt to foster relationships. While the assurance of confidentiality may encourage relationships of trust, privileges inhibit rather than facilitate the search for truth. Privileges therefore are not easily found or endorsed by the courts. The existence and scope of a statutory privilege ultimately turns on the language and meaning of the statute itself. Even so, the goal of statutory construction is to ascertain and facilitate the intent of the Legislature. [Citations and internal quotation marks omitted.]

"[S]tatutory privileges are narrowly defined, while their exceptions are broadly construed." *People v Childs*, 243 Mich App 360, 364-365; 622 NW2d 90 (2000).

## C. PRIVILEGE – LAW AND APPLICATION

We shall take a two-step approach in our analysis. With respect to step one, we examine whether, in general, defendant's communications constituted privileged communications, concluding that his conversation with Ginther was *generally* privileged. In regard to step two, we examine whether the privilege was effectively waived or lost in light of the nature or substance of some of his communications. On this issue, we hold that the privilege was effectively waived or lost to the extent that defendant voiced threats of physical violence against reasonably identifiable third persons as to whom he had the apparent intent and ability to carry out the threats in the foreseeable future.

"Privilege is governed by the common law, except as modified by statute or court rule." MRE 501. In this case, there is no dispute that the issue of privilege is governed by Michigan statutory law and not our common law. Under the Michigan Mental Health Code, MCL 330.1001 *et seq.*, "[p]*rivileged communications* shall not be disclosed in civil, criminal, legislative, or administrative cases or proceedings, or in proceedings preliminary to such cases or proceedings, unless the patient has waived the privilege, except in the circumstances set forth in this section." MCL 330.1750(1) (emphasis added). Pursuant to MCL 330.1700(h), a "privileged communication" is "a communication made to a psychiatrist or psychologist in connection with the examination, diagnosis, or treatment of a patient, or to another person while the other person is participating in the examination, diagnosis, or treatment or a communication made privileged under other applicable state or federal law."

We initially note that the prosecution devotes considerable time arguing that a communication is privileged only when made to a "mental health professional," as that term was defined in MCL 330.1100b(15)[5] at the time of the crisis hot-line call, and that Ginther was not a "mental health professional" under the statutory definition. However, neither MCL 330.1750 (generally barring the use of "privileged communications" in court proceedings) nor MCL 330.1700(h) (defining a "privileged communication") makes any reference whatsoever to the term "mental health professional." And the prosecution's citation of *Dawe v Dr Reuven Bar-Levav & Assoc, PC*, 485 Mich 20; 780 NW2d 272 (2010), in support of its argument lacks merit, considering that the *Dawe* Court only referenced the term "mental health professional" in the context of construing MCL 330.1946. *Dawe*, 485 Mich at 22, 25, 27-34. MCL 330.1946 creates a duty for mental health professionals to warn or protect third persons with respect to dangerous patients under certain circumstances, see *Dawe*, 485 Mich at 27-28; it does not pertain to the establishment of a privilege. Later in this opinion we shall address the effect of MCL 330.1946 on a recognized privilege, but for now we are focused on simply determining whether defendant's communications were generally privileged.

Reading MCL 330.1750(1) in conjunction with MCL 330.1700(h), there are three broad scenarios in which a communication can become privileged, providing protection from disclosure of the communication in court cases and proceedings. First, a "communication made to a psychiatrist or psychologist in connection with the examination, diagnosis, or treatment of a patient" is ordinarily privileged and cannot be disclosed unless waived by the patient. MCL 330.1700(h); MCL 330.1750(1). The prosecutor argues that Ginther was not a psychiatrist or a psychologist, which is true, and that, moreover, Ginther was not examining, diagnosing, or treating defendant during the crisis hot-line call. Defendant contends that he was effectively a patient of a psychiatrist or psychologist considering his status as a patient of Crossroads and Bay Arenac Behavioral Health, which were staffed by psychiatrists and psychologists who participated in and oversaw operations. Defendant maintains that Ginther's work on the crisis hot-line was simply an extension or part of defendant's treatment in relation to after-hours and emergency-type mental health care that he was in need of when he called the hot-line. For the reasons explained below, we find it unnecessary to address the parties' arguments in regard to this particular scenario contemplated by MCL 330.1750(1) and MCL 330.1700(h).

The second scenario under MCL 330.1750(1) and MCL 330.1700(h) in which a privilege typically arises and affords protection from disclosure is when a communication is made "to another person [aside from a psychiatrist or psychologist] while the other person is participating in the examination, diagnosis, or treatment" of a patient. This language envisions a patient being examined, diagnosed, or treated by a psychiatrist or psychologist, with another "person" participating in the examination, diagnosis, or treatment who then engages in communications with the patient. The parties present various arguments with respect to this language; however, we again find it unnecessary to address and resolve these arguments, given our conclusion that

---

[5] See 2012 PA 500. MCL 330.1100b was subsequently amended pursuant to 2014 PA 72 and 2014 PA 200, shifting the definition of "mental health professional" to subsection (16) of the statute with minor variations in the definition that are not relevant to our current discussion.

the third scenario contemplated by MCL 330.1750(1) and MCL 330.1700(h) was implicated in this case.[6]

The third scenario under MCL 330.1750(1) and MCL 330.1700(h) in which a privilege can arise and afford protection from disclosure is when "a communication [is] made privileged under *other applicable state or federal law*." (Emphasis added.) Accordingly, this language incorporates by reference other statutory privilege provisions, as well as common-law privilege principles, existing under either state or federal law. We begin with a fairly brief examination of federal law. First, FRE 501 provides:

> The common law – as interpreted by United States courts in the light of reason and experience – governs a claim of privilege unless any of the following provides otherwise:
>
> • the United States Constitution;
>
> • a federal statute; or
>
> • rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

HIPAA immediately comes to mind as potentially applicable, but federal courts have indicated, "We do not think HIPAA is rightly understood as an Act of Congress that creates a privilege." *Northwestern Mem Hosp v Ashcroft*, 362 F3d 923, 926 (CA 7, 2004) (noting the purely procedural character of HIPAA in regard to disclosure of information in judicial proceedings); see also *United States v Bek*, 493 F3d 790, 802 (CA 7, 2007); *Wade v Vabnick-Wener, MD*, 922 F Supp 2d 679, 685 n 6 (WD Tenn, 2010).[7] However, the United States Supreme Court has held that, by means of federal common law, "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." *Jaffee v Redmond*, 518 US 1, 15; 116 S Ct 1923; 135 L Ed 2d 337 (1996). The *Jaffee* Court further ruled:

> All agree that a psychotherapist privilege covers confidential communications made to licensed psychiatrists and psychologists. We have no hesitation in concluding in this case that the federal privilege should also extend to confidential communications made to licensed social workers in the course of

---

[6] We do note that there was no evidence in the record that defendant had been directly examined, diagnosed, or treated by a psychiatrist or psychologist; the professional or licensing status of Crossroad's "Vanessa" was never explored.

[7] We have not been directed to any federal statute or constitutional provision that would create a privilege under the circumstances of this case.

psychotherapy. The reasons for recognizing a privilege for treatment by psychiatrists and psychologists apply with equal force to treatment by a clinical social worker . . ., social workers provide a significant amount of mental health treatment. Their clients often include the poor and those of modest means who could not afford the assistance of a psychiatrist or psychologist, but whose counseling sessions serve the same public goals. Perhaps in recognition of these circumstances, the vast majority of States explicitly extend a testimonial privilege to licensed social workers. [*Id.* at 15-17 (citations omitted).]

Here, according to Moore, Ginther only had a "limited" license, and she did not view crisis hot-line workers as providing psychotherapy. That said, the federal common-law privilege recognized in *Jaffee*, as employed through the conduit of FRE 501, has been extended by the Ninth Circuit to cover communications made by employees to work-site based counselors, even though the counselors were not licensed psychiatrists, psychologists, or social workers. *Oleszko v State Compensation Ins Fund*, 243 F3d 1154 (CA 9, 2001). The federal appellate court noted that, despite being unlicensed, the counselors all had "backgrounds in psychology or social work, including relevant clinical and/or field experience." *Id.* at 1156. In *United States v Lowe*, 948 F Supp 97, 99 (D Mass, 1996), a federal district court extended the federal common-law privilege recognized in *Jaffee* to encompass communications made to rape crisis counselors, who were specially trained but not licensed psychotherapists or social workers, but who were required to operate under the supervision of a licensed professional. An analogy could be made between the work performed by a rape crisis counselor as addressed in *Lowe* and Ginther's work on the mental health crisis hot-line.

We are not aware of any precedent from the United States Supreme Court that has addressed the issue of privilege under a set of facts similar to those presented here. And the opinions from lower federal courts on the subject of extending *Jaffee* to even arguably comparable facts are indeed sparse. We thus are not prepared to conclude that defendant's communications to Ginther were generally privileged under definitive federal law. On the other hand, with respect to state law and as explained below, there is clear statutory support for the conclusion that defendant's communications were, in general, confidential and privileged.

The parties and the circuit court paid no heed to Kristy Moore's testimony that Ginther, at the time of the incident, had a "[l]imited license, [b]achelor of social work." Ginther testified that he had a bachelor's degree, but had not yet earned a master's degree, in social work, but he was not directly questioned regarding any licensures. Moore discussed the nature of Ginther's limited license, agreed that the license was temporary, and explained the differences between limited and full licenses. She testified that Ginther had been working towards a "full licensure of . . . [b]achelors in social work." Under MCL 333.18509(2), the board of social work "may grant a *limited license* to engage in the 2-year postdegree experience required under subsection (1)[8]

---

8 Under subsection (1) of MCL 333.18509, to become a fully "licensed bachelor's social worker," an individual "shall have been awarded a bachelor's degree in social work from a college or university social work program approved by the board and shall have completed at least 2 years of full-time postbachelor's degree experience, or the equivalent in part-time hours,

to an individual who has completed all the educational requirements for licensure as a *bachelor's social worker* or a master's social worker." (Emphasis added.) Additionally, MCL 333.18506 provides:

> An individual who is granted a limited license under section 18509(2) to engage in the 2-year postdegree experience in the practice of social work at the bachelor's or master's level shall practice under the supervision of a licensed master's social worker and confine his or her practice to an agency, a health facility, an institution, or another entity approved by the board.

Ginther practiced under Moore's supervision, and Moore was a licensed master's social worker. The relevancy of Ginther's "limited license" to our privilege issue is revealed in MCL 333.18513, which, amongst other licensed social workers, covers limited licensed bachelor's social workers, and which provides in pertinent part:

> (1) An individual registered or licensed under this part [Part 185 of the Public Health Code (PHC), MCL 333.1101 *et seq.*] . . . is not required to disclose a communication or a portion of a communication made by a client to the individual or advice given in the course of professional employment.

> (2) Except as otherwise provided in this section, a communication between a registrant or licensee or an organization with which the registrant or licensee has an agency relationship and a client is a confidential communication. A confidential communication shall not be disclosed, except under either or both of the following circumstances:

> (a) The disclosure is part of a required supervisory process within the organization that employs or otherwise has an agency relationship with the registrant or licensee.

> (b) The privilege is waived by the client or a person authorized to act in the client's behalf.

> . . .

> (4) A registrant or licensee may disclose a communication or a portion of a communication made by a client pursuant to section 946 of the mental health code, 1974 PA 258, MCL 330.1946, in order to comply with the duty set forth in that section.

Given that Ginther had a limited license, bachelor's of social work, as governed by Part 185 of the PHC, that defendant was a client of Bay Arenac Behavioral Health and its "contract agency" Crossroads, as testified to by Moore, and considering that the communications at issue were made in the course of Ginther's professional employment with Bay Arenac Behavioral

in the practice of social work at the bachelor's level under the supervision of a licensed master's social worker."

-11-

Health, we conclude that MCL 333.18513 generally rendered defendant's communications confidential and privileged. Accordingly, it can accurately be stated that those communications, in general, were "made privileged under . . . applicable state . . . law," thereby fitting the definition of a "privileged communication," MCL 330.1700(h), and in turn ordinarily barring disclosure of the communications in a criminal case or proceeding, MCL 330.1750(1).

With respect to step two in our analysis, we must next determine whether the privilege was effectively waived or lost, allowing for disclosure in the criminal prosecution against defendant. MCL 330.1750(2) lists a variety of circumstances in which "[p]rivileged communications shall be disclosed upon request." But none of those circumstances are applicable here. However, MCL 330.1750(4) provides that "[p]rivileged communications may be disclosed under [MCL 330.1946] to comply with the duty set forth in that section." Furthermore, as reflected above, MCL 333.18513, which gave rise to the privilege in the first place, provides in subsection (4) that "[a] . . . licensee may disclose a communication or a portion of a communication made by a client pursuant to . . . MCL 330.1946, in order to comply with the duty set forth in that section."

Accordingly, we turn our attention to MCL 330.1946, which provides, in relevant part, as follows:

(1) If a patient communicates to a mental health professional who is treating the patient a threat of physical violence against a reasonably identifiable third person and the recipient has the apparent intent and ability to carry out that threat in the foreseeable future, the mental health professional has a duty to take action as prescribed in subsection (2). Except as provided in this section, a mental health professional does not have a duty to warn a third person of a threat as described in this subsection or to protect the third person.

(2) A mental health professional has discharged the duty created under subsection (1) if the mental health professional, subsequent to the threat, does 1 or more of the following in a timely manner:

(a) Hospitalizes the patient or initiates proceedings to hospitalize the patient . . . .

(b) Makes a reasonable attempt to communicate the threat to the third person and communicates the threat to the local police department or county sheriff for the area where the third person resides or for the area where the patient resides, or to the state police.

(c) If the mental health professional has reason to believe that the third person who is threatened is a minor or is incompetent by other than age, takes the steps set forth in subdivision (b) and communicates the threat to the department of social services in the county where the minor resides and to the third person's custodial parent, noncustodial parent, or legal guardian, whoever is appropriate in the best interests of the third person.

. . .

-12-

(4) A mental health professional who determines in good faith that a particular situation presents a duty under this section and who complies with the duty does not violate [MCL 330.1750]. . . . A certified social worker, social worker, or social worker technician who determines in good faith that a particular situation presents a duty under this section and who complies with the duty does not violate section 1610 of the occupational code, Act No. 299 of the Public Acts of 1980, being section 339.1610 of the Michigan Compiled Laws. . . . .[9]

The prosecution relies on MCL 330.1946 in support of its argument that the statute creates a "threat of physical violence" exception to any assumed privilege and that the exception extends to testimony in court and not only the initial warning to others. MCL 330.1946 indicates that it is only a "mental health professional" who is saddled with the duty to warn or protect under the circumstances outlined in the statute. Interestingly, while the prosecutor emphatically argues that Ginther was not a "mental health professional" for purposes of determining the existence of a privilege, the prosecutor proceeds to accept without pause the applicability of MCL 330.1946 to carve out a privilege exception, absent the acknowledgement that the duty under MCL 330.1946 extends only to a "mental health professional."

At the time of the crisis hot-line call, MCL 330.1100b(15), subsequently amended by 2014 PA 72 and 2014 PA 200, defined a "mental health professional" as "an individual who is trained and experienced in the area of mental illness or developmental disabilities and who is . . . [a] physician . . ., [a] psychologist . . ., [a] registered professional nurse . . ., [*a*] *licensed master's social worker licensed under MCL 333.16101 to 333.18838* . . ., [a] licensed professional counselor . . ., [or] [a] marriage and family therapist . . . ." See 2012 PA 500 (emphasis added). Ginther was not a physician, psychologist, nurse, licensed professional counselor, or marriage and family therapist, and while he was licensed under MCL 333.18509(2) and MCL 333.18506, it was not as a master's social worker. Thus, at first blush, it would appear that there was no duty to warn or protect under MCL 330.1946, which would seem to circumvent any argument that MCL 330.1946 provided a basis to dissolve the statutory privilege. However, as touched on earlier, because Ginther only had a limited license, he was required to "practice under the supervision of a licensed master's social worker." MCL 333.18506. Moore, Ginther's supervisor, was a licensed master's social worker who was trained and experienced in the area of mental illness, and a licensed master's social worker qualifies as a "mental health professional" under the prior MCL 330.1100b(15)(d).[10] Because Ginther necessarily worked in tandem with and under the statutorily-mandated supervision of Moore, and because Moore was obligated to

---

[9] We note that MCL 339.1610 was repealed by the Legislature pursuant to 2000 PA 11; however, the Legislature failed to make a contemporaneous change to MCL 330.1946(4) to reflect the repeal of MCL 339.1610. Social work is now addressed in Part 185 of the PHC, and the privilege provision, as alluded to above, is found in MCL 333.18513.

[10] Moore would also be considered a "mental health professional" under the current version of the statute. MCL 330.1100b(16)(d).

-13-

review Ginther's work, as she did in this case, we conclude that whether it was Moore or Ginther, there was a duty to warn and protect under MCL 330.1946.[11]

Having ruled that MCL 330.1946 was implicated here, we must next address the circuit court's determination that once the required warning was given and the duty was dispatched under MCL 330.1946, no further disclosures were permissible. Framed a bit differently, the question is whether a generally privileged communication can be disclosed in a court case or proceeding after the communication was properly disclosed to satisfy the duty under MCL 330.1946 or after there was a recognized failure to comply with the duty under the statute. We hold that the Legislature, in enacting MCL 330.1946, intended and envisioned the use of an otherwise privileged communication in a court case or proceeding when the duty to warn or protect was indeed implicated in a given matter.

While the statutory scheme allows for disclosure of a privileged communication to comply with the duty to warn or protect set forth in MCL 330.1946, there is ultimately no language that expressly addresses the status of such a communication post disclosure or where MCL 330.1946 was implicated but the mental health professional failed to make the required disclosure. We cannot agree that the lack of such language means that the privilege is somehow revived or resurrected. MCL 330.1946 was clearly and indisputably enacted to protect the safety of a third person from a patient who voiced a threat of physical violence against the person to a treating mental health professional. A mental health professional can satisfy the duty under MCL 330.1946 when it arises by making a reasonable attempt to communicate a particularized threat to a threatened third person in conjunction with communicating the threat to the police. MCL 330.1946(2)(b). It would defy logic and the legislative intent to conclude that once a disclosure is made pursuant to MCL 330.1946(2)(b), the threatening communication cannot be disclosed or used in court cases or proceedings, considering that the protection the Legislature intended to afford third persons would not be fully realized. For example, once a third person was warned of a specific threat, the third person could not effectively utilize the court system to obtain protection from the threat, e.g., procurement of a personal protection order (PPO), if the threatening communication was not subject to disclosure or admissible in a PPO proceeding, MCR 3.701 *et seq.* By way of another example, once the police were made aware of a specific threat of physical violence against a third person, they would be significantly handcuffed with respect to protecting the third person, as an arrest would not be a viable avenue of protection because supporting testimony by the mental health professional could not be obtained.

Additionally, a mental health professional can satisfy the duty under MCL 330.1946 when it arises by hospitalizing a patient or initiating "proceedings to hospitalize [a] patient" under MCL 330.1400 *et seq.* (civil admission and discharge procedures regarding the mentally ill) and MCL 330.1498a *et seq.* (civil admission and discharge procedures for emotionally

---

[11] The circuit court did conclude that MCL 330.1946 was implicated and that Ginther had a duty to warn and protect. We agree that defendant communicated threats of physical violence against reasonably identifiable third persons and that he had the apparent intent and ability to carry out those threats in the foreseeable future. MCL 330.1946(1).

-14-

disturbed minors). MCL 330.1946(2)(a). It is nonsensical to conclude that after a mental health professional hospitalizes a patient or initiates proceedings to hospitalize a patient in compliance with the statutory duty under MCL 330.1946, the mental health professional is barred from testifying about threats in subsequent and related hospitalization and commitment proceedings involving the patient. Furthermore, under MCL 330.1946(2)(c), if the threatened third person is a minor or incompetent, the Department of Human Services (DHS) must be alerted, along with others, and clearly the Legislature implicitly accepted and understood that DHS would initiate protective proceedings in court in some instances in order to protect the minor or incompetent person from the patient. If the Legislature did not so intend, what conceivable purpose would there be in requiring a mental health professional to alert DHS of a dangerous patient, especially given that the mental health professional would have already been required to notify the minor or incompetent person, the police, and the parent or legal guardian of the minor or incompetent person. MCL 330.1946(2)(c).

Even more enlightening on the issue would be a situation in which MCL 330.1946 was implicated, but the mental health professional failed to comply with the duty, with the threatened third person later being injured or killed by a patient. In that circumstance, it is beyond reasonable argument that the third person or his or her estate would have a cause of action against the mental health professional. See *Dawe*, 485 Mich 20 (determining whether a common-law cause of action for malpractice by a mental health professional could be maintained or whether MCL 330.1946 now governed all such suits). But if the underlying threatening communication could not be disclosed and was inadmissible in court proceedings, the lawsuit would necessarily fall apart and would be unsustainable. The Legislature certainly did not intend or envision the exclusion of threatening communications in a civil action against a mental health professional for breach of the duty set forth in MCL 330.1946.

A privilege may be waived by operation of law. *Saur v Probes, MD*, 190 Mich App 636, 640; 476 NW2d 496 (1991). We hold that once MCL 330.1946 was implicated and the duty to warn or protect became mandatory, the privilege enjoyed by defendant was effectively and permanently waived or lost by operation of law to the extent of communications that threatened physical violence against reasonably identifiable third persons as to whom defendant had the apparent intent and ability to carry out the threats in the foreseeable future.[12] To rule otherwise, in our view, would reflect a wholesale failure to honor the principles that privileges should not be easily endorsed by a court, *Stanaway*, 446 Mich at 658, and that an exception to a statutory privilege must be broadly construed, *Childs*, 243 Mich App at 364-365.

The *Stanaway* Court observed that statutory privileges attempt to foster relationships and assure confidentiality. *Stanaway*, 446 Mich at 658. Given that threatening communications fitting with the parameters of MCL 330.1946(1) can be properly disclosed to police, third

---

[12] We note that although the record did not show that defendant had received notice by Crossroads or Ginther that communications falling within the parameters of MCL 330.1946 could be disclosed and used in court, nothing in MCL 330.1946 indicates or remotely suggests that such notice must be given before the statute is implicated.

persons, hospital personnel, social services, and parents and guardians, any confidentiality and fostered relationship existing before disclosure will be significantly fractured and nearly if not entirely eviscerated after disclosure. To use a colloquial expression, "the cat has been let out of the bag" following disclosure. To then simply permit testimony or evidence in court regarding a threatening communication that has already been disclosed does little if anything to further erode confidentiality. Precluding the testimony or evidence concerning a threatening communication will not magically restore the lost confidentiality or rebuild the damaged relationship caused by a disclosure.

We now take a moment to address some federal caselaw cited by defendant in support of his argument that once disclosure or a warning is made in compliance with MCL 330.1946, no further disclosures are permitted in a criminal prosecution of a patient. Defendant relies on *United States v Hayes*, 227 F3d 578, 586 (CA 6, 2000), which held that the federal common-law, psychotherapist-patient privilege, while not preventing a psychotherapist from complying with a duty to warn or protect innocent third parties, serves as a bar to the psychotherapist actually testifying against a patient in a criminal prosecution for threats made by the patient during a psychotherapy session. The prosecutor in *Hayes* unsuccessfully argued in favor of a "dangerous patient" exception to the psychotherapist-patient testimonial privilege that would have allowed for the psychotherapist to testify in court about patient threats made in the course of counseling. The Eighth and Ninth Circuits have joined the Sixth Circuit in rejecting a dangerous-patient exception to the federal psychotherapist-patient privilege. *United States v Ghane*, 673 F3d 771, 785-786 (CA 8, 2012); *United States v Chase*, 340 F3d 978, 985-992 (CA 9, 2003). However, the Tenth Circuit has indicated that a psychotherapist may testify against a defendant patient in a criminal case about a threat made by the patient if "the threat was serious when it was uttered and . . . its disclosure was the only means of averting harm . . . when the disclosure was made." *United States v Glass*, 133 F3d 1356, 1360 (CA 10, 1998). We also note the following language in *United States v Auster*, 517 F3d 312, 318-319 (CA 5, 2008), where the Fifth Circuit made an observation consistent with our's regarding the minimal benefit, if any, to a psychotherapist-patient relationship that would result by disallowing trial testimony when a warning was already permissible:

> The deleterious effect of a . . . warning on the "atmosphere of confidence and trust" is further reinforced by the knowledge that the intimate details of therapy will be spread to more than just the target of the threat. There is, after all, no obligation that the target keep the . . . warning confidential, and it is unrealistic to believe that he will do so . . . .

> Thus, knowing that anyone, or everyone, might be privy to the secret will embarrass the patient and will detrimentally affect his relationships with others. Such a disclosure might also cost the patient his job. The marginal increase, therefore, in effective therapy achieved by privileging psychotherapist-patient communications at trial, but still allowing the therapist to warn threatened third parties, is *de minimis.*

We further note that the United States Supreme Court in *Jaffee*, 518 US at 18 n 19, indicated:

-16-

Although it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist.

We have already concluded that there is no definitive federal law recognizing a privilege under the facts of this case; therefore, the dangerous-patient exception and the question regarding its applicability under federal law need not be reached. Moreover, *Hayes* does not reflect a definitive federal principle with respect to the applicability of the dangerous-patient exception, given the little and indeed conflicting federal caselaw on the subject. And the footnote in *Jaffee*, 518 US at 18 n 19, tends to lend support for recognizing a dangerous-patient exception to the privilege. In sum, we reject defendant's federal caselaw arguments.

### D. 911 RECORDING – HEARSAY ARGUMENT

Defendant argues that assuming we hold that the evidence is not inadmissible on the basis of privilege, as we have now ruled, the 911 recording is nevertheless inadmissible as hearsay, absent any exception. The 911 recording can be viewed as a memorialization of Ginther's effort to comply with the duty to warn and protect under MCL 330.1946. The 911 recording contained Ginther's statements that in turn recalled defendant's alleged statements and threats. Because the circuit court never reached this issue, and because resolution of the issue could entail examination of the exceptions to hearsay, MRE 803, which may require underlying factual determinations, we leave the issue for the circuit court to address on remand.

### III. CONCLUSION

We hold that although defendant's communications were generally privileged, the privilege was effectively waived or lost to the extent that defendant voiced threats of physical violence against reasonably identifiable third persons as to whom he had the apparent intent and ability to carry out the threats in the foreseeable future, MCL 330.1946(1).[13] Testimony at trial concerning threats falling within the parameters of MCL 330.1946(1) is not excludable on the basis of privilege. For purposes of clarity on remand, testimony regarding portions of defendant's communications that provide context to any threats are also not barred by privilege.[14] And of course, should defendant himself wish to introduce into evidence *any* part of

---

[13] To be clear, despite the preliminary determination regarding the existence of threats for purposes of resolving the privilege issue under MCL 330.1946(1), the jury remains free to find that no threats were made in rendering a verdict on the threat-of-terrorism charge. See MRE 104.

[14] We note that we reject, for the reasons given by the circuit court, the prosecution's waiver-of-privilege argument that was based on defendant speaking on the phone to Ginther while police were present at defendant's residence.

his communications in his defense, privilege will not preclude the evidence, as defendant has full control over waiving the privilege.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ William B. Murphy
/s/ Patrick M. Meter
/s/ Deborah A. Servitto