# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 29, 2016

Plaintiff-Appellee,

v

No. 324423
Wayne Circuit Court
LC No. 14-004782-FC

JOHNATHON MICHAEL MCMAHEN,

Defendant-Appellant.

Before: K. F. KELLY, P.J., and FORT HOOD and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of first-degree premeditated murder, MCL 750.316(1)(a). Defendant was sentenced to a term of life imprisonment. For the reasons set forth in this opinion, we affirm.

## I. FACTS

This case arises from the disappearance of Racine Taliaferro in late April 2014. Racine was defendant's girlfriend and was living with him in Detroit at the time of her disappearance. Racine's body has never been found. Defendant was a member of the Satan's Sidekicks Motorcycle Club (the motorcycle club), where he was known as "John Doe" or "JD" and where women are considered the property of men and only men can be members of the motorcycle club. Racine was last seen with defendant at the motorcycle club headquarters at 48301 East Davidson in Detroit in the early morning hours of April 27, 2014.

In the early morning hours of April 27, 2014, between 1:00 a.m. and 2:00 a.m., Racine's close friend, Alfreda Robinson observed and heard defendant and Racine in a heated confrontation in the motorcycle club's restroom. At one point during the altercation the restroom door was barricaded shut. During this physical altercation, Robinson heard Racine tell defendant she did not want to leave the motorcycle club with him, and defendant tried to physically pull Racine out of the motorcycle club. Racine then took off defendant's motorcycle colors that she had been wearing which proclaimed her the property of defendant. Robinson observed that Racine was very angry and fearful at this time and Racine exclaimed that defendant "had [her] on the floor with a knife to her neck." Merry Wade also testified that she saw defendant yanking Racine out of the club.

-1-

When defendant and Racine were asked to take their physical confrontation outside, they sat in defendant's black GMC Jimmy truck with Racine in the front passenger seat and defendant standing in front of her, blocking her exit, and the pair continued to argue. When Robinson attempted to approach the couple, defendant would not allow her to speak with Racine. After Robinson went back inside the motorcycle club for about 20 minutes, she came back outside and found that Racine and defendant had left. Robinson never saw or heard from Racine again.

Defendant later returned to the club alone about 45 minutes later but did not speak to Robinson. Robinson left the motorcycle club about 6:00 a.m. the morning of April 27, 2014. She became concerned about Racine when she had not talked to her all week and no one else had heard from her. Robinson then contacted defendant by text message asking if he knew where Racine was. Defendant responded that Racine was not with him and he stated that he and Racine had broken up. Defendant also stated that Racine did not take her cell phone when she left because he had paid for her cell phone. After Robinson attempted to contact defendant to discuss the matter further by phone, defendant did not respond to her calls and Robinson made a missing persons report.

Robinson also testified that defendant was aware that Racine was intimately involved with other men during the course of her relationship with defendant. Derrick McAdory, also a member of the motorcycle club, testified that he was in an intimate relationship with Racine at an unspecified point of time and that he was text messaging back and forth with Racine in early April 2014. During McAdory's testimony it became clear that some information regarding his relationship with Racine had been "publicly disbursed[ ]" throughout the motorcycle club.

Lachana Taliaferro, Racine's younger sister, testified that she had not heard from Racine since April 26, 2014. At the time of trial in September 2014, Lachana had tried to contact her sister by text and phone every day and had received no response. Lachana and her family were still looking for Racine at the time of trial. According to Lachana, Racine was very good about responding to Lachana regularly on Facebook before her disappearance.

During the early morning hours of April 27, 2014, the morning after Racine was last seen, defendant awakened Merry Wade and Jason Wedel, both of whom were staying at his home. Defendant asked Wade and Wedel to leave the house so that he could speak to Racine in private. Wade described defendant as very anxious at that time and pacing the room. While Wade waited for someone to come and pick her up from defendant's house, she tried to call Racine twice, but the calls went straight to Racine's voicemail. Defendant told Wedel, also a member of the motorcycle club, not to return to the house until 5:00 p.m. Wedel testified that there was no sign of Racine in the house that morning, but he thought she was in her bedroom asleep. When Wedel called defendant later that day, defendant told him that he had broken up with Racine and kicked her out of his home.

Wedel returned to defendant's home three days later. Defendant informed Wedel that he had given Racine three days to collect her personal belongings, and stated that he would be moving a new girlfriend into the home. Wedel assisted defendant move Racine's personal belongings out of the home and into an abandoned home next door. Police later recovered the belongings from the abandoned home. Wade stated that when she returned to defendant's home on April 28, 2014, to retrieve her personal belongings, she attempted to enter the home's

basement, but defendant intervened and stopped her and defendant went down to the basement himself to retrieve Wade's belongings.

Defendant engaged in other conduct related to the disappearance. On the afternoon of April 27, 2014, defendant visited a T-Mobile store and sold Racine's cell phone. In addition, defendant contacted Randy Hendricks in the days following Racine's disappearance and asked him to do some regular cleaning duties that he routinely performed around defendant's home. Defendant made an unordinary request for Hendricks to clean his basement with straight bleach and water, and Hendricks declined to do so for safety reasons. While he was cleaning, Hendricks discovered what appeared to be dried blood on defendant's bedroom door, and as he tried to clean it off, defendant said to him, "is that what I think it is?" Hendricks then informed defendant the substance was dried blood and it was difficult to clean. Hendricks testified that defendant stated that he was tired of women lying to him. When defendant asked Hendricks to bag up Racine's clothes and place them in the vacant house next door, Hendricks declined.

Paisley Almore was defendant's ex-girlfriend, she had been in contact with defendant in early and mid-April 2014, and then in early May 2014 after she saw a missing persons flyer for Racine on Facebook. Following Racine's disappearance, Almore had several conversations with defendant about Racine. For reasons not entirely clear from the record, Almore asked defendant why there were bloody clothes at the house next to his home following Racine's disappearance. Almore testified that defendant told her that "[Racine's] clothes were bloody because when you choke someone and they take their last breath the person cough[s] up blood." According to Almore, defendant told her that he choked Racine in his car. Defendant also told Almore that he and Racine had engaged in a physical altercation after he found out that Racine had engaged in infidelity.

Although defendant originally told Almore that Racine had jumped out of his car at Woodward and Davidson after they fought, Almore "called [defendant's] bluff" and defendant then admitted to choking Racine. According to Almore, defendant then got out of his car at his home and noticed that Racine did not follow him out of the car. Because defendant thought Racine was intoxicated and asleep, he left her in the car, and when he went back to the car to help her he realized that Racine did not have a pulse. Defendant also told Almore that he put Racine in the back of his truck and that he placed her body in a building but did not identify the location of the building. Defendant planned to leave Michigan to travel to California and he told Almore that "with no body there's no case."

William Bell, an inmate housed in the same ward of the Wayne County Jail as defendant, testified that defendant informed him that Racine had engaged in infidelity, disrespected him, and was romantically involved with someone else in the motorcycle club. Bell testified that defendant stated that he and Racine had an argument in his vehicle and defendant choked Racine. Defendant told Bell that he did not know that Racine had died and he left her in his vehicle. When he returned to his vehicle later to check on her, defendant discovered that Racine was not breathing. According to Bell, defendant then took Racine's body to a vacant house.

Dr. Carl Schmidt, Wayne County Chief Medical Examiner, testified that the evidence presented at trial that Racine had coughed up blood as she was being choked was consistent with what would take place during a strangulation. Officer Jarmaire McIntire testified regarding the

extent of the police search efforts including the use of cadaver dogs to search at defendant's home, the vacant house next door, the surrounding neighborhood and a prior address of defendant's. Officer McIntire also testified regarding the visor of defendant's GMC Jimmy truck, which was admitted into evidence and contained foot impressions consistent with someone kicking against the visor.

Officer McIntire also testified about several Facebook postings from defendant's Facebook page. Specifically, Office McIntire testified as follows:

> *Q*. I'm going to hand you some documents. I'm going to ask you to look at those . . . Would you read the evidence tag number and describe what's there?

> *A*. I have in my hand . . . it is a screen shot capture of a Facebook page for John Doe, SSMC. We later learned that was John Doe, the defendant, which was his motorcycle club name. SSMC stood for Satan Sidekick Motorcycle Club. On this page that I'm looking at it was dated May 2ⁿᵈ, titled John Doe Satan Sidekick Motorcycle Club, I hug the people I hate, So I know how big to dig the hole in my backyard.

> Next photograph is labeled Peoples Exhibit No. 4, dated today's date, John Doe, Satan Sidekicks Motorcycle Club. The date that this picture was uploaded was April 26ᵗʰ, it says a walk in the woods helps me relax and release tension, the fact I am dragging a body should be entirely irrelevant. There's a photograph of a wooded area with the words input in the photograph.

> Next is People's Exhibit No 5 . . . This post was updated on April 26ᵗʰ. It says that what I be telling them you always got more than one hoe. And it's a caption of a man and a woman speaking. And there's also a picture of the serial killer, Jason, from Friday the 13ᵗʰ and above his head it says, oh, look, she's running away.

> [] People's Exhibit No. 6. Again, it's also screen captured from the defendant's Facebook page, photograph of Jason, the serial killer from the Friday the 13ᵗʰ movies, the caption that was within the photograph reads I'll wait until she trips over nothing. Bitches always tripping over nothing.

> And the next photograph is Peoples Exhibit No 7 dated April 27ᵗʰ, is when the post was made by the defendant, and his status update is, it says single, can't stand unfaithful lying bitches . . .

Office McIntire offered similar testimony about additional Facebook postings. Thereafter, defendant was convicted and sentenced as set forth above. This appeal ensued.

## II. ANALYSIS

On appeal, defendant first argues that the prosecution failed to establish the corpus delicti of first-degree premeditated murder before defendant's inculpatory statements were admitted into evidence. Defendant raised this issue in the trial court and the trial court addressed and

-4-

denied defendant's corpus delicti challenge; therefore, the issue was preserved for our review. *People v Ish*, 252 Mich App 115, 116; 652 NW2d 257 (2002).

We review a trial court's decision regarding the application of the corpus delicti rule for an abuse of discretion. *People v King*, 271 Mich App 235, 239; 721 NW2d 271 (2006). A trial court's decision amounts to an abuse of discretion when it falls outside the range of reasonable and principled outcomes. *People v Martz*, 301 Mich App 247, 253; 836 NW2d 243 (2013).

In *Ish*, 252 Mich App at 116, this Court explained that "[t]he purpose of the corpus delicti rule is to prevent the use of a defendant's confession to convict him of a crime that did not occur" (citation omitted). Accordingly, the prosecution is not permitted to present evidence of a defendant's confession in a criminal case unless it presents direct or circumstantial evidence that is independent of the defendant's confession that the "specific injury or loss occurred and that some criminal agency was the source or cause of the injury." *Id*. (citation omitted); see also *People v Schumacher*, 276 Mich App 165, 180; 740 NW2d 534 (2007). Such evidence is required before the prosecution may introduce a defendant's inculpatory statements. *People v McMahan*, 451 Mich 543, 548; 548 NW2d 199 (1996). Therefore, once the prosecution introduces evidence satisfying the corpus delicti of the crime, "appropriate extrajudicial confessions of the accused are admissible." *Id*. at 549-550. In a murder prosecution, the corpus delicti rule requires proof of a death caused by criminal agency. *Id*. at 549.

The trial court did not abuse its discretion in holding that the corpus delicti in this first-degree premeditated murder prosecution was established before defendant's inculpatory statements were admitted. Before defendant's statements were admitted, the prosecution presented ample circumstantial evidence to prove that Racine was deceased and that her death resulted from criminal agency at the hands of defendant. *Ish*, 252 Mich App at 116. Here, evidence showed that defendant and Racine were involved in a heated physical altercation at the motorcycle club. Robinson testified that defendant physically forced Racine to leave the club with him after which Racine removed defendant's motorcycle colors in a public display. Robinson testified that Racine was angry and fearful at the time and Racine exclaimed to Robinson that defendant had held her on the floor of the restroom with a knife to her neck. Wade also observed defendant dragging the victim out of the motorcycle club against her will. The argument continued outside the motorcycle club in defendant's truck with defendant obstructing Racine from leaving the front passenger seat. When defendant drove away with Racine, she was never seen again.

In addition to introducing evidence to show that defendant had the opportunity to kill Racine, the prosecution also introduced evidence to support that defendant had motive to kill the victim. See e.g. *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008) (while not an element of the crime, "evidence of motive in a prosecution for murder is always relevant"). Specifically, evidence showed that there was significant discord between defendant and Racine because she had been involved in an intimate relationship with another motorcycle club member at the time leading up to her disappearance. Defendant's statements to witnesses following Racine's disappearance showed that he was angry about the infidelity.

Moreover, evidence of defendant's other behavior following the disappearance showed that Racine was deceased and that her death resulted from defendant's criminal act. *Ish*, 252

Mich App at 116. Both Wade and Wedel testified about defendant's suspicious behavior early on the morning after Racine was last seen alive, when he awakened them both unexpectedly and asked them to leave his home so he could speak to Racine in private. Neither Wade nor Wedel recalled seeing Racine in the home that day. Defendant also sold Racine's cell phone shortly after their violent altercation at the motorcycle club and enlisted Wedel's help in discarding her personal belongings in a vacant house next to his home in the days following her disappearance. Furthermore, defendant prevented Wade from entering his basement shortly after the disappearance and then asked a friend to clean his basement with bleach and water. The friend then discovered dried blood on the door to defendant's bedroom.

Defendant cites *McMahan*, 451 Mich at 549-550, to support that the prosecution failed to establish the corpus delcti of first-degree murder. In *McMahan*, an individual named Carolyn Kenyon left her apartment and was not seen or heard from again. *Id*. at 545. Aside from the defendant's inculpatory confession that he killed Carolyn Kenyon, there was virtually no evidence of criminal agency leading to her death. After this Court reversed the defendant's jury trial conviction of second-degree murder on the basis of virtually nonexistent evidence leading to Carolyn Kenyon's disappearance, our Supreme Court affirmed. *Id*. at 547, 553.

The *McMahan* Court distinguished the facts of that case from those of *People v Brasic*, 171 Mich App 222; 429 NW2d 860 (1988), and *People v Modelski*, 164 Mich App 337; 416 NW2d 708 (1987). The *McMahan* Court noted that in *Brasic*, there was evidence of physical violence by the defendant toward the victim in the time leading up to the victim's disappearance. *McMahan*, 451 Mich at 552. The *McMahan* Court further observed that in *Modelski*, the facts showed evidence of significant marital discord between the defendant and the victim, including allegations of infidelity leading up to the victim's disappearance after which the defendant gave away the victim's personal belonging. *McMahan*, 451 Mich at 552. The *McMahan* Court concluded:

> We agree with the Court of Appeals that evidence of criminal agency equivalent to that in *Brasic* and *Modelski* is not present in the instant case. Although the trial testimony indicates that Carolyn Kenyon was last seen alive with defendant, there was no testimony of any problems or altercations between the defendant and Carolyn Kenyon either on the night she disappeared or anytime previously in their relationship. [*McMahan*, 451 Mich at 552-553.]

This case is dissimilar to *McMahan* and more akin to *Brasic* and *Modelski*. Here, unlike in *McMahan*, evidence showed that defendant and Racine had a violent encounter in the hours leading up to her disappearance, their relationship was in a state of discord and was strained by allegations of infidelity, defendant was the last person seen with her, and defendant disposed of her personal belongings shortly after her disappearance. This circumstantial evidence is similar to the evidence in *Brasic* and *Modelski*, which was sufficient to establish the corpus delicti of the crimes in those cases. Thus, contrary to defendant's argument, *McMahan* supports that the trial court did not abuse its discretion in rejecting defendant's corpus delicti challenge.

In short, before introducing defendant's inculpatory statements, the prosecution presented sufficient evidence to establish that Racine was deceased and that her death resulted from

criminal agency at the hands of defendant. *Ish*, 252 Mich App at 116. The trial court did not abuse its discretion in rejecting defendant's corpus delicti challenge. *Id*.

Defendant next contends that the trial court erred in admitting postings from his Facebook page.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *People v Carrier*, 309 Mich App 92, 103-104; 867 NW2d 463 (2015). To the extent that we are required to interpret a rule of evidence, our review is de novo. *Id*. Because defendant failed to preserve his hearsay and authentication arguments, our review is for plain error affecting defendant's substantial rights. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014).

Defendant first argues that the Facebook postings were not properly authenticated. This argument lacks merit.

MRE 901(a) governs the authentication of evidence and it provides:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

"An example of authentication or identification that conforms to the requirements of MRE 901(a) is '[t]estimony that a matter is what it is claimed to be.'" *People v McDade*, 301 Mich App 343, 352; 836 NW2d 266 (2013), quoting MRE 901(b)(1). "It is axiomatic that proposed evidence need not tell the whole story of a case, nor need it be free of weakness or doubt. It need only meet the minimum requirements for admissibility." *Id*. (quotation marks and citation omitted).

With respect to the Facebook postings, at trial the prosecution confirmed with Officer McIntire that he reviewed defendant's Facebook page. Officer McIntire then went through the Facebook postings confirming that they were screen shot photographs of a Facebook page assigned to John Doe of Satan's Sidekicks Motorcycle Club, an alias that defendant routinely employed. There was no assertion made at trial that the Facebook page did not belong to defendant. Officer McIntire's testimony was sufficient to show that the Facebook postings were what the prosecution claimed them to be and the testimony satisfied the authentication requirements of MRE 901(a) and the trial court did not err in admitting the evidence. *McDade*, 301 Mich App at 352.

Next, defendant argues that the Facebook postings amounted to inadmissible hearsay. We disagree.

MRE 801(d)(2) provides in relevant part that admissions of a party opponent are non-hearsay when:

> [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity . . . (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a

statement by a person authorized by the party to make a statement concerning the subject. . . .

In this case, the Facebook postings were statements that were posted on defendant's Facebook page and there was nothing to support that the statements were posted by anyone other than defendant. As such, the statements were admissions and were non-hearsay under MRE 801(d)(2) and the trial court did not abuse its discretion in admitting the statements into evidence. *Carrier*, 309 Mich App at 103-104.

Next, defendant argues that the probative value of the Facebook postings was substantially outweighed by unfair prejudice.

MRE 403 provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In *People v Daniels*, ___ Mich App ___; ___ NW2d ___ (2015) (Docket No. 320499); slip op at 9, this Court observed that MRE 403 is employed "sparingly" to exclude evidence, and that when determining "whether the probative value of evidence is substantially outweighed by unfair prejudice" pursuant to MRE 403, the trial court should engage in a balancing test that weighs the following factors:

the time required to present the evidence and the possibility of delay, whether the evidence is needlessly cumulative, how directly the evidence tends to prove the fact for which it is offered, how essential the fact sought to be proved is to the case, the potential for confusing or misleading the jury, and whether the fact can be proved in another manner without as many harmful collateral effects. [*Daniels*, ___ Mich App at ___; slip op at 9-10, quoting *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).]

MRE 403 has traditionally been used to "exclude[] otherwise admissible evidence because the evidence is overly sensational or needlessly cumulative." *People v Uribe*, 310 Mich App 467, 472; 872 NW2d 511 (2015) (footnote omitted). Additionally, the determinations made pursuant to MRE 403 are best left to the trial court, which is in a better position to make a contemporaneous assessment of the presentation, credibility and effect of testimony. *Blackston*, 481 Mich at 462.

In this case, the Facebook postings were relevant to show why police began investigating defendant and to show motive and defendant's state of mind during the days leading up to and after the victim disappeared. Defendant made statements about murdering people, about dragging a dead body through the woods, about burying a dead body in his backyard, and he updated his status to show he was single. In addition, defendant made derogatory statements about women including a statement wherein he indicated he was single and stated "can't stand unfaithful lying bi—s." These postings were relevant to show discord in defendant's relationship with the victim, which was probative of motive. See *Unger*, 278 Mich App at 223.

-8-

In addition to being relevant, the probative value of the evidence was not significantly outweighed by the danger of unfair prejudice. MRE 403. "All relevant evidence is prejudicial; it is *only unfairly prejudicial* evidence that should be excluded." *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005) (citation omitted). Unfair prejudice arises where there is a possibility that evidence with minimal probative value will be given undue weight by the jury. *Id.* at 614 (citation omitted). Where the evidence has the potential to raise issues extraneous to the merits of the case, such as jury bias, shock, sympathy or anger, the danger of unfair prejudice is very much present. *Id.* (citation omitted).

Here, the evidence was not unfairly prejudicial. *Id.* The evidence did not raise issues extraneous to the merits of the case, it did not cause undue delay, it was not needlessly cumulative, and there was low potential to confuse or mislead the jury. *Blackston*, 481 Mich at 462; *McGhee*, 268 Mich App at 613-614. Moreover, given the nature of the case, the evidence was not of minimal probative value, but rather it was highly relevant to show motive and state of mind. *McGhee*, 268 Mich App at 613-614. In short, the trial court did not abuse its discretion in admitting the Facebook postings. *Carrier*, 309 Mich App at 103-104.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood
/s/ Stephen L. Borrello

-9-