PEOPLE v MARTZ

Docket No. 307916. Submitted May 14, 2013, at Marquette. Decided
    May 30, 2013, at 9:05 a.m.

Calvin F. Martz was convicted by a jury in the Marquette Circuit
    Court, Thomas L. Solka, J., of first-degree criminal sexual conduct,
    unlawful imprisonment, resisting or obstructing a police officer
    causing serious impairment of a body function, and two counts of
    resisting or obstructing a police officer. Defendant appealed.

    The Court of Appeals *held*:

    The documents presented by defendant that allegedly gave
    defendant authority over the victim had no probative value or
    relevance to whether defendant used force or coercion to accom-
    plish sexual penetration with the victim. The trial court did not
    abuse its discretion by refusing to admit the documents in evi-
    dence. The trial court did not abuse its discretion by determining
    that the testimony of the police officers who arrested defendant
    almost a week after defendant committed his acts of resisting and
    obstructing officers during the execution of a search warrant at
    defendant's residence was not relevant to defendant's claim that
    the police had engaged in misconduct when executing the search
    warrant. The trial court did not abuse its discretion when it did
    not allow defendant to call as witnesses the officers who arrested
    him.

    Affirmed.

*Bill Schuette*, Attorney General, *John J. Bursch*,
Solicitor General, *Matthew J. Wiese*, Prosecuting Attor-
ney, and *Cheryl L. Hill*, Chief Assistant Prosecuting
Attorney, for the people.

*F. Randall Karfonta* for defendant.

Before: RONAYNE KRAUSE, P.J., and GLEICHER and
BOONSTRA, JJ.

RONAYNE KRAUSE, P.J. Defendant appeals as of right his convictions by a jury of first-degree criminal sexual conduct (CSC I), MCL 750.520b (force or coercion); unlawful imprisonment, MCL 750.349b; resisting or obstructing a police officer causing serious impairment of a body function, MCL 750.81d(3); and two counts of resisting or obstructing a police officer, MCL 750.81d(1). Defendant was sentenced as a second-offense habitual offender, MCL 769.10, to concurrent imprisonment for 15 to 40 years for the CSC I conviction, 15 to 22$\frac{1}{2}$ years for the unlawful imprisonment conviction, 10 to 15 years for the resisting and obstructing a police officer causing serious impairment conviction, and 16 months to 2 years for the resisting and obstructing a police officer conviction. We affirm.

This case arises out of a long, controlling, and abusive relationship between the complainant, Stephanie, her mother, Karen,[1] and defendant. Defendant claimed to be Stephanie's husband. According to Karen, they were married on May 18, 2000, when Stephanie was 21 years old, by a "Marriage Covenant" document.[2] Stephanie contended that the signature on the document was not hers and she had not been present when the document was created. According to Stephanie, defendant had claimed to be her husband since she was about 14 years old, at which time defendant would have been approximately 46 years old.[3] Stephanie testified

---

[1] Karen was apparently convicted of unlawful imprisonment for her role in the events of this case. She does not have an appeal pending at this time.

[2] Michigan does not recognize common-law marriages purportedly contracted after January 1, 1957. *Carnes v Sheldon*, 109 Mich App 204, 211; 311 NW2d 747 (1981).

[3] Marriage to a person under the age of 16 is void. MCL 551.51. Furthermore, although the age difference between a victim and a perpetrator of criminal sexual conduct is only relevant to CSC IV,

that she was afraid of defendant and had a personal protection order (PPO) against him. She explained, however, that her attempts to live away from defendant were undermined by her concern for her mother, with whom defendant continued to live.

Despite her concern about defendant, Stephanie decided in May 2011 to visit her mother. She contacted a state police officer to confirm that *she* would not be in violation of the PPO if she happened to encounter defendant. She left a note in her apartment for a friend explaining that she had gone to visit her mother and would be back. She left the radio on, a "purse wallet" behind, and her pain and psychiatric medications behind. She also left her cat, to whom Stephanie was a dedicated caretaker. No one was initially home when Stephanie arrived at defendant's and Karen's residence, but defendant arrived shortly thereafter and apparently believed Stephanie "was back to stay." Stephanie testified that defendant told her "you're going to stay here and you're going to stick to me like glue." She also testified that defendant followed her around the house, even accompanying her to the outhouse.[4]

That evening, defendant told her to go to his bedroom and she complied, despite being afraid "[b]ecause in the past he has been mean to me." Stephanie testified that defendant had hit her before, knocking her "jaw bone out of alignment." Defendant joined her in the bedroom, where he disrobed her and "forced" her to have sex with him, which caused her to bleed "[i]n my private." She testified that defendant believed he had a right to have sex with her because "[h]e thinks that I'm

---

specifically MCL 750.520e(1)(a), the "age of consent" in Michigan is otherwise 16 years of age. MCL 750.520b, MCL 750.520c, MCL 750.520d.

[4] The house lacked indoor plumbing.

his wife," and had considered her to be so since she was 14 years old. She testified that she was afraid to tell him that she did not want to have sex with him, and in the past when she said so, "[h]e would do it anyway, usually." She testified that defendant had first attempted to be intimate with her "a couple of days after" he told her that she would be his wife. Stephanie testified that she did not tell her mother that defendant had raped her because her mother also considered Stephanie to be married to defendant, "so she thinks that it is alright for him to have sex with me." Karen, in contrast, testified that Stephanie had a motorbike that she rode "[a]ll over the place" and that Stephanie could have left any time she wished, including during a shopping trip. Stephanie testified that she could not have left because defendant was always with her.

The manager at Stephanie's apartment became concerned when she did not see Stephanie for a few days. Other friends, including Stephanie's outpatient clinician at a mental health clinic, also became concerned. Several of them went to Stephanie's apartment with police officers and were admitted by the manager, where they discovered that Stephanie's cat had not been given food or water, and several of Stephanie's essentials, such as her cellphone and medication, had been seemingly abandoned. A friend received an envelope in the mail containing Stephanie's keys and a note stating that she would not be back and requesting that her cat be returned to the Humane Society.

A "well-being check" was commenced by the police at defendant's property. Initially, officers parked off the premises, walked to the door, identified themselves, and asked to talk. Defendant "started screaming at [them] to get off his property, that [they were] violating his civil rights, and that [they were] trespassing." Stephanie

testified that she heard defendant shouting at the police, but she was with her mother, "stuck in the back seat of a pickup truck" on the property, and when she tried to leave, Karen told her to remain where she was and stay silent. The police retreated and obtained a search warrant. In anticipation that defendant would not be cooperative, the local police and the Michigan State Police received assistance from the Upper Peninsula Substance Enforcement Team (UPSET), which had training in breaching houses. The officers wore attire marking them as police.

The police spent several minutes knocking on the door continuously, and they further made announcements with a loudspeaker. Stephanie testified that she heard the police announce themselves, bang on the door, and say her name. She testified that defendant told her and Karen "to be quiet and close the curtains." She observed defendant pace the floor, peek out the curtains, and retrieve a can of pepper spray and take it to the front door. Karen testified that she heard nothing because the house was "pretty darn sound-proof," and she believed any sounds from the door were from a bear that occasionally visited the area. The officers eventually decided to breach the door to the home.

The first two officers through the doors to the home testified that they were hit with a chemical spray causing immediate eye irritation and difficulty breathing. Karen confirmed that defendant had sprayed bear mace. Defendant later explained to officers that he had sprayed bear mace because he believed a bear was outside, although when "he recognized that it was a person with a gun," he decided to spray the mace anyway. As the officers retreated, one fell off the porch and broke his ankle. The officers then noticed "a commotion" in the house, and Stephanie "kind of

spilled" out of the door. They noticed that it appeared that someone was holding onto the back of her shirt. Karen testified that she tried to restrain Stephanie from leaving the house because she was concerned that the mace would harm her. Stephanie testified that defendant was the one who grabbed her shirt, and that he told her "that God told him to spray the police officers." Officers summoned Stephanie over to them and moved her "out of any line of fire." Because they had accomplished the purpose of the search warrant, the police then left with Stephanie. They subsequently obtained a warrant for defendant's arrest.

Defendant's theory of the case was generally that any relationship between himself and Stephanie was consensual, and also that she was known to make up stories and hallucinate while taking her medication. In an effort to prove these contentions, defendant attempted to introduce several other documents. One purported to set forth "my inalienable religious rights" and essentially sought to convey all Stephanie's rights to defendant. Another also discussed Stephanie's religious beliefs and stated that defendant was not engaged in any fraud and had to consent to any signature Stephanie executed; it also indicated that without defendant's knowledge or consent Stephanie was being forcibly kept on drugs that caused her to hallucinate. Another document was a "Pathways preliminary plan/individual plan of service" bearing Stephanie's signature and over which defendant had written "NULL AND VOID" and an additional note that "Romans 7:2 As Stephanies [sic] husband, Calvin F Martz, I only have authority for consent in all matters conserning [sic] Stephanie . . . and my consent is not given. You are discriminating against Stephanies [sic] and my religious rights." Defendant's first argument on appeal is that the trial

court erroneously refused to admit these documents, which he contends were necessary to support his defense. We disagree.

We review a trial court's decision to admit or deny evidence for an abuse of discretion. *People v Layher*, 464 Mich 756, 761; 631 NW2d 281 (2001). An abuse of discretion occurs when the trial court chooses an outcome falling outside "the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). MRE 401 provides that relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The theory pursued by the prosecution at trial was that defendant used force or coercion "to accomplish sexual penetration." MCL 750.520b(1)(f). None of the proffered documents, even if taken at face value, make it less probable that defendant used force or coercion to accomplish sexual penetration.

Engaging in the presumption that any of the documents were themselves executed consensually by Stephanie, the most they could show would be that defendant and Stephanie believed themselves married to each other, that defendant had assumed the right to make decisions regarding Stephanie's medical care and contractual arrangements, and that Stephanie had issues with hallucinations while on certain medications. Absolutely none of those things conferred upon defendant a right to have nonconsensual sex with Stephanie. Furthermore, absolutely none of those things in any way disprove a coercive relationship between the two of them. Indeed, a casual reading of the documents strongly suggests a controlling and coercive relationship. The barbaric notion that a person cannot rape

their spouse has long since been abolished, and the existence of a caretaker relationship would seem to give rise to a *greater* obligation to refrain from exercising dominion over a ward, rather than constituting evidence that control is not in fact being exercised.[5] Furthermore, Stephanie's alleged issues with hallucinations while on her medicines were actually explored at trial and presented to the jury.

The documents purporting to give defendant authority over Stephanie had no probative value or relevance regarding whether defendant used force or coercion to accomplish sexual penetration with Stephanie. The trial court's exclusion of those documents was not an abuse of discretion. Even if there might have been some possible probative value to the documents regarding Stephanie's hallucinations, any such evidence would have been cumulative, and their exclusion was harmless beyond a reasonable doubt, particularly in light of Stephanie's own testimony at trial that her medicines caused hallucinations. The trial court again did not err. See *People v Fortson*, 202 Mich App 13, 18; 507 NW2d 763 (1993).

Defendant argues next that the trial court abused its discretion when it did not allow him to call as witnesses the officers who arrested him. Defendant argues that the testimony of the arresting officers was essential to

---

[5] We note that any grant of a power of attorney, patient advocacy, or other agency relationship fundamentally entails the principal's right to control the agent. See *St Clair Intermediate Sch Dist v Intermediate Ed Ass'n/Mich Ed Ass'n*, 458 Mich 540, 557-558; 581 NW2d 707 (1998). The document at issue here purporting to grant defendant not only control over the victim's decisions but, significantly, also an essentially unilateral right to preclude the victim from making her own decisions or to revoke the purported agency is not evidence of an agency relationship of any sort. It is evidence of coercion rather than evidence of an exercise of free will. If anything, its exclusion from evidence could only have worked in defendant's favor.

his defense to the resisting and obstructing charges. However, defendant was arrested almost a week after the fact for his acts of resisting and obstructing officers during the execution of the search warrant at his residence on May 6, 2011. Defendant argued at trial that the *arresting* officers' testimony was relevant to his claim that the police engaged in misconduct when executing the *search* warrant. Clearly, defendant's arrest was based on events that occurred during the search. However, the arresting officers would not have had any personal knowledge of the events that occurred at the search and rescue. Consequently, their testimony would not have shed any light on any issue of consequence. The trial court therefore did not abuse its discretion be determining their testimony irrelevant.

Affirmed.

GLEICHER and BOONSTRA, JJ., concurred with RONAYNE KRAUSE, P.J.