*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

STEPHEN SCOTT HORTON,

        Defendant-Appellant.

UNPUBLISHED
April 24, 2025
9:05 AM

No. 355783
Iron Circuit Court
LC No. 18-009797-FH

Before: PATEL, P.J., and CAMERON and LETICA, JJ.

PER CURIAM.

Defendant appeals as on leave granted[1] his guilty-plea conviction of manufacturing methamphetamine, MCL 333.7401(2)(b)(*i*). He was sentenced to 4 years and 6 months to 20 years' imprisonment. Following oral argument on defendant's appeal, we held this case in abeyance until a decision was rendered in *People v Samuels*, 509 Mich 985; 974 NW2d 188 (2024). *People v Horton*, unpublished order of the Court of Appeals, entered January 3, 2023 (Docket No. 355783). The Supreme Court decided *People v Samuels*, ___ Mich ___; ___ NW3d ___ (2024) (Docket No. 355783), on July 12, 2024. We now affirm in part and remand for proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

This case arose from a search of defendant's home in July 2018 where a methamphetamine laboratory was discovered. Specifically, members of the Upper Peninsula Substance Enforcement Team (UPSET) received an alert from the National Precursor Log Exchange (NPLEx) that

---

[1] Although this Court denied defendant's application, *People v Horton*, unpublished order of the Court of Appeals, entered February 17, 2021 (Docket No. 355783), our Supreme Court remanded this case to this Court for consideration as on leave granted. *People v Horton*, 509 Mich 917; 971 NW2d 220 (2022).

defendant purchased pseudoephedrine (PSE), an active ingredient in Sudafed[2] on July 18, 2018. PSE, when combined with other components, including drain opener, lye, salt, and lithium removed from batteries, creates methamphetamine. Within hours of defendant's Sudafed purchase, Dana Horton (Dana), defendant's "wife,"[3] also bought Sudafed.[4] Additionally, Michigan State Police (MSP) Detective Josh Burrell and MSP Detective Sergeant Jason Varoni, UPSET's district supervisor, learned that the couple's associates, Courtney Felder and Steven Ozanic, were on the NPLEx watch list.[5] In light of the detectives' training and experience, purchases of PSE in close proximity in time signified that the manufacture of methamphetamine would occur in the near future. And both defendant and Dana had charges pending in Standish, Michigan, for possession of cocaine and heroin. Because of the concern that the couple were about to engage in the "shake and bake" or cooking of methamphetamine, the detectives traveled to Iron County to further investigate.

Varoni proceeded to the drug store where Dana bought the Sudafed and spoke with the clerk. The clerk gave information about the car Dana drove, her employment, and whether she was currently at work. Meanwhile, Burrell drove by the addresses where the couple and their associates purportedly lived. Thereafter, Burrell and Varoni began surveilling the restaurant where Dana worked as a waitress. The detectives contacted MSP Troopers Dan DeVowe and Warren Webster to assist them. After Dana left work, these uniformed state troopers in a marked vehicle

---

[2] Sudafed is a brand name for a nasal decongestant that contains PSE.

[3] In their interviews with law enforcement and department of corrections employees, defendant and Dana represented that they were married. However, in the lower court record, defendant's prior presentence investigation report (PSIR) indicated that the couple were divorced. But, defendant's most recent PSIR referenced the couple as married according to common-law. Michigan does not recognize common-law marriage. MCL 551.2; MCL 551.101; *Lueck v Lueck*, 328 Mich App 399, 405; 937 NW2d 729 (2019). See also *People v Martz*, 301 Mich App 247, 248 n 2; 836 NW2d 243 (2013) ("Michigan does not recognize common-law marriages purportedly contracted after January 1, 1957."). During oral argument in this appeal, we sought clarification regarding the status of the couple's relationship from defendant's counsel. Counsel later notified this Court that the couple was not married, despite their previous representations to the contrary.

[4] More specifically, defendant purchased PSE at 5:05 p.m. central time while Dana purchased PSE at 1:37 p.m. central time.

[5] A limit of nine grams of PSE could be purchased in 30 days, and a limit of 3.6 grams could be purchased in one day. A purchaser of PSE was required to provide identification, including name and address, to complete the purchase, and the retailer recorded the purchase in the computer for the NPLEx system. If a purchaser exceeded those amounts in the designated time-period, the purchase was blocked, and the retailer could not complete the sale. An MSP intel specialist compiled a chart of the PSE purchases and blocks. Defendant and Dana were the highest purchasers in the counties covered by UPSET. Before her July 2018 arrest, Dana also recruited coworkers to purchase Sudafed for her by representing that she was sick.

performed a traffic stop. At approximately 10:30 p.m., Dana was stopped because she did not have a valid driver's license.

Dana was removed from her vehicle. She was placed in Varoni's vehicle and advised of her *Miranda*[6] rights. Dana agreed to waive her rights and speak to Varoni.[7] Dana acknowledged that she had charges pending related to a different traffic stop when drugs were found in the car. She expected the charges against her to be dropped because defendant would take responsibility for the drugs found in the car. Varoni inquired about Dana's participation in the preparation of methamphetamine or her use of the drug. Dana did not expressly answer specific questions, citing her tiredness. When questioned about her recent purchase of Sudafed, Dana explained that she went to a drug store, encountered an insurance issue, and was unable to fill her prescription. She purchased Sudafed and offered that the allergy medication was at her home in the bathroom. Dana agreed to show Varoni that the Sudafed was at her home. For safety purposes, the detectives inquired about any occupants at the couple's home and the presence of any weapons. Dana stated that she was unsure whether defendant was at home and whether he was engaged in any home projects. After seeing the plain-clothes detectives put on vests and other police markings, Dana expressed discomfort with her decision. She was placed in a marked patrol car and rode with the MSP troopers to her home.[8] At the conclusion of the interview, Varoni was heard commenting that he did not learn enough information from Dana to acquire a search warrant.

The detectives and MSP troopers arrived at a small home estimated at 800 square feet. There was an active fire pit in the backyard. The home consisted of a main floor and a basement. Both floors of the home were illuminated. The detectives noted there were black garbage or plastic bags covering the windows. Nonetheless, they testified a kitchen table with methamphetamine materials and ingredients were visible through a gap in the window coverings. Specifically, the detectives saw a bowl, measuring cups, Powerade bottles, drain opener or lye, a large salt canister, and tools, such as cutters. Detective Burrell went to the back of the home where he observed the active fire pit, a jug possibly used in methamphetamine production, and a stairway leading down to the basement. The basement door was cracked open an inch or two.

Varoni knocked on the front door. After a short time, defendant opened the door, stepped outside the home, and closed the door behind him. Defendant had sweated through his shirt, beads of sweat were running down his head, and his eyes displayed "pinpoint" pupils. According to Varoni, defendant appeared to be under the influence of drugs. Varoni asked if defendant needed medical attention. Defendant refused, explaining that he was hot because he had tended to the bonfire in the backyard. When asked if Varoni could enter the home, defendant refused. The purpose of the materials on the kitchen table was raised, and defendant claimed they were used for household projects. Burrell reported his findings to Varoni, specifically the jug in the backyard

---

[6] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[7] At the time of this arrest, MSP did not have body cameras. But, Varoni recorded his interview with Dana. A recording of the interview was admitted by stipulation at the couple's preliminary examination.

[8] From Dana, the detectives learned that the address they had for the couple belonged to a relative. Dana gave the couple's current address and they drove to that location.

with suspected methamphetamine sludge in the reaction vessel. Additionally, the detectives discussed what could be seen through the window. At that time, defendant was placed under arrest.

As a result of the visit to defendant's home, it was determined that probable cause existed to obtain a search warrant. But, the detectives were concerned that additional individuals, such as defendant's associates Ozanic and Felder, may be present or that a volatile methamphetamine laboratory was active inside the home. The detectives and Trooper Webster performed a protective sweep of the home that lasted about a minute. In the basement, they observed a makeshift ventilation hood and one active pot of methamphetamine engaged in the reaction phase. Burrell left the scene to prepare and obtain the search warrant. As he left, Burrell passed defendant seated in the front of Varoni's vehicle. Burrell opined that defendant was under the influence of drugs because his face was smashed against the window, he was soaked in sweat, and he stared out into space.

After Burrell obtained the search warrant, he contacted Varoni and notified him of the approval. The fire department and members of the methamphetamine team began the clean-up at the scene. The ingredients and components used to cook, mix, and prepare methamphetamine were photographed, removed from the home, and placed on a blanket.

At the end of the two-day preliminary examination, both defendant and Dana were bound over on charges of conspiracy to manufacture methamphetamine, MCL 333.7401(2)(b)(*i*) and (c), manufacture of methamphetamine, MCL 333.7401(2)(b)(*i*), operating a methamphetamine laboratory, MCL 333.7401(c)(2)(a), and purchasing ephedrine or PSE for the purpose of manufacturing methamphetamine, MCL 333.17766c(1)(d). Defendant was not bound over on the charge of maintaining a drug house, MCL 333.7405d.

Thereafter, defendant moved to suppress evidence taken from his home and his person. Specifically, defendant alleged that the officers were unable to see the items on his table because of the plastic covering and the table's distance from the window. Moreover, the items on the table had a legitimate use in home construction and were insufficient to establish probable cause. Defendant further asserted that the contents of the jug outside the back of the home contained an unknown substance that was not ascertainable and could not serve as probable cause for a search warrant. Defendant also claimed that there was no legitimate basis for the "protective" sweep because Dana did not indicate that anyone else would be present and there were no other vehicles. He opined that the search warrant affidavit was faulty because it failed to properly identify the home's exterior and the view of the interior through the narrow window covering. Lastly, defendant asserted that the search of his wallet was illegal; defendant was in custody at the time of the search, and the wallet's contents were not dangerous.

The prosecutor opposed the motion to suppress. The prosecutor contended that the police observations and actions supported the contents of the search warrant that were described with sufficient particularity. The protective sweep of the home was valid under exigent circumstances and the search of defendant's wallet was incident to his arrest.

The trial court held that the protective sweep of the home was unconstitutional and quashed the evidence obtained during the sweep. Accordingly, the trial court struck paragraph 14, addressing the observation of the one-pot during the protective sweep, from the search warrant

affidavit. The trial court determined that the search warrant affidavit described the premises with reasonable particularity despite defendant's sufficiency challenge and denied the motion to quash on that ground. Even so, the history of PSE purchases, "everything" found on the kitchen table, and the officers' experience combined to support probable cause to obtain a search warrant. Thus, the items found during the protective sweep were not suppressed under the inevitable discovery doctrine. Lastly, the trial court denied defendant's motion to suppress the receipts seized from defendant's wallet as a search incident to arrest.

In November 2019, defendant entered a guilty plea.[9] In exchange for defendant's plea to the manufacture of methamphetamine, MCL 333.7401(2)(b)(*i*), the prosecutor agreed to dismiss the three other charges as well as the fourth habitual offender notice. Additionally, the sentencing agreement was a minimum of 54 months to the maximum penalty of 20 years. Further, an offer previously extended to Dana was to "remain open at this time."[10] When the factual basis for entry of the plea occurred, defendant sought to change the plea from guilty to no-contest. In support, defendant offered that Dana, as the codefendant, had not yet entered her plea, and expressed concern that "should that plea agreement fall through" that his plea statement could be used against Dana, "his wife." Defendant argued that there was "good cause" to change the plea from guilty to no-contest. The prosecutor asserted that a no-contest plea was permitted on grounds of civil liability or lack of memory, and she was obligated to extend the plea offer to Dana. The plea offer would not go forward if Dana chose not to accept it. The prosecutor opined that there was no reason for defendant to enter a no-contest plea, and she would not agree to a no-contest plea. Therefore, if defendant insisted on a no-contest plea, the plea offer to defendant would be withdrawn. The trial court determined that the grounds to offer a no-contest plea were not present[11] because civil liability and lack of recollection were not at issue. And, the court noted that the prosecutor extended a plea offer to Dana that was available until two weeks before the trial date. Thus, defendant agreed to move forward and continued to provide a factual basis for his guilty plea. Defendant acknowledged that between July 19-20, 2018, he knowingly manufactured or created methamphetamine in the city of Caspian.

In January 2020, defendant appeared for sentencing, but first sought to withdraw his plea because the trial court did not accept his no-contest plea.[12] Defendant seemingly asserted that a no-contest plea was appropriate because a preliminary examination occurred and would provide a

---

[9] Defendant had been appearing in the case *in propria persona* but with the assistance of standby counsel. At one point in this hearing, defendant requested that counsel assume the representation.

[10] Apparently, an offer was extended to Dana with a sentencing guideline range of 5 to 23 months.

[11] See *In re Guilty Plea Cases*, 395 Mich 96, 134; 235 NW2d 132 (1975).

[12] In a jail call recording with a relative, defendant challenged the prosecutor's ability to convict him. Specifically, defendant claimed that he had not finished the cook of methamphetamine. Further, he questioned the timing of the search compared to the execution of the search warrant. At the preliminary examination, it was learned that UPSET team members received word when the search warrant was signed because the team and the fire department were waiting to commence the clean-up of the one-pot methamphetamine lab.

factual basis. Again, the trial court denied the motion, noting that the grounds for a no-contest plea, civil liability and lack of recollection, were not presented. Alternatively, defendant claimed that plea withdrawal was warranted because of coercion. But, the trial court noted that defendant failed to allege a miscarriage of justice or evidence of innocence. In contrast, the prosecutor argued that defendant made his plea in exchange for a plea offer being extended to Dana. Thus, the prosecutor requested that defendant's plea withdrawal also include setting aside Dana's plea. Defendant then questioned the suppression ruling, the actions by the police, and his counsel's representation that Dana would only receive a jail sentence. But, defendant acknowledged that the court was not bound by any sentencing guideline range agreed to by the parties. After conferring with his counsel, defendant withdrew the motion to withdraw his plea. Defendant reaffirmed his plea and was sentenced to 54 months to 20 years' imprisonment.[13] We now address the appeal as on leave granted.[14]

## II. ILLEGAL SEARCH

Defendant contends that the search of his person and property should be suppressed because it was without probable cause.[15] We disagree.

"This Court reviews for clear error a trial court's findings of fact made after a suppression hearing, but reviews de novo the ultimate decision on a motion to suppress." *People v Rodriguez*, 327 Mich App 573, 583; 935 NW2d 51 (2019). "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Chaney*, 327 Mich App 586, 587 n 1; 935 NW2d 66 (2019) (quotation marks and citation omitted). A trial

---

[13] After the appointment of appellate counsel, defendant subsequently filed another motion to withdraw his plea that the trial court denied. This motion also sought to correct an invalid sentence but that ruling is not challenged in this appeal.

[14] We denied defendant's application for leave to appeal, *People v Horton*, unpublished order of the Court of Appeals, entered February 17, 2021 (Docket No. 3355783), but our Supreme Court ordered the appeal addressed as on leave granted.

[15] Typically, in the absence of a conditional plea preserving a Fourth Amendment challenge, *People v Reid*, 420 Mich 326, 331; 362 NW2d 655 (1984), a defendant who pleads guilty waives such a challenge. *People v New*, 427 Mich 482, 485; 398 NW2d 358 (1986). In this case, defendant did not plead guilty conditionally; however, in the process of addressing defendant's motion to withdraw his plea, the court misadvised defendant that he "certainly [had] a right on appeal to bring [the Fourth Amendment] issue to the Court of Appeals," later adding that "the Court of Appeals could decide I'm wrong," before defendant reaffirmed his plea. Therefore, we will address defendant's Fourth Amendment challenges. See *People v Sundling*, 152 Mich App 277, 283-284; 395 NW2d 308 (1986) ("We conclude that [the] defendant's plea was entered into upon the belief, based upon a statement of the trial court, which was unobjected to by the people, that [the] defendant's right to appeal the motion to suppress was preserved. In the interest of judicial integrity, we are inclined to honor that belief and review the merits of [the] defendant's claim.").

court's decision addressing a motion to withdraw a plea is reviewed for an abuse of discretion. *People v Bailey*, 330 Mich App 41, 49; 944 NW2d 370 (2019).

> The Fourth Amendment guarantees to the people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" US Const, Am IV. It further states that "no Warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id*. Similarly, the Michigan Constitution of 1963 provides that "[t]he person, houses, papers, [and] possessions . . . of every person shall be secure from unreasonable searches and seizures" and that "[n]o warrant to search any place or to seize any person or things . . . shall issue without describing them, nor without probable cause, supported by oath or affirmation." Const 1963, art 1, § 11.[16] [*People v Brcic*, 342 Mich App 271, 277; 994 NW2d 812 (2022).]

The lawfulness of a search and seizure is contingent upon its reasonableness. *People v Nguyen*, 305 Mich App 740, 751; 854 NW2d 223 (2014). "Probable cause means that there is a substantial basis for inferring a fair probability that contraband or evidence of a crime will be found in a particular place." *People v Armstrong*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket No. 165233), slip op p 8 (quotation marks and citation omitted). "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of criminal activity." *Nguyen*, 305 Mich App at 752 (quotation marks and citation omitted). Whether probable cause exists is contingent on the totality of the circumstances, and circumstantial evidence and reasonable inferences arising therefrom may establish probable cause. *Id*. "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *People v Frederick*, 500 Mich 228, 234-235; 895 NW2d 541 (2017) (quotation marks and citation omitted).

The totality of the circumstances demonstrates that there was probable cause to support the issuance of the search warrant. Members of UPSET received information that defendant and Dana were the two most frequent purchasers as well as blocked purchasers of PSE, a component used in the manufacture of methamphetamine. Additionally, the couple's associates were also on the NPLEx list. Varoni and Burrell proceeded to defendant's location upon learning that the couple had purchased Sudafed within hours of each other. After learning information from the seller of Sudafed, a traffic stop of Dana occurred because she had a suspended license. Dana agreed to speak to the troopers but gave ambiguous answers regarding prior drug use. She acknowledged that she had drug charges pending against her, but claimed that they would be dismissed because defendant would accept responsibility for the drugs. Nonetheless, Dana represented that her recently purchased Sudafed was at the home shared with defendant. Upon arriving at the home, the troopers knocked on the door and observed the components to make methamphetamine on the kitchen table despite the black plastic sheeting covering most of the window. When defendant

---

[16] We note that Const 1963, art 1, §11 was amended effective 2020 to specifically include protection for electronic data and communications.

answered the door, he appeared with "pinpoint pupils" and was sweating profusely. After being placed in a police vehicle, defendant appeared to stare into space. Defendant's history of PSE purchases and blocked transactions, his associates' purchases of PSE, his pending drugs charges, the presence of methamphetamine components gathered on his kitchen table,[17] and his appearance reflected a "probability or substantial chance of criminal activity." *Nguyen*, 305 Mich App at 752. When describing the production of methamphetamine, the troopers acknowledged the chemical reactive process involved common household items such as lye, lithium batteries, and bottles. The trial court did not err in concluding that there was probable cause to support the issuance of the search warrant in light of the totality of the circumstances.[18]

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that trial counsel was ineffective for failing to file an interlocutory appeal after the motion to suppress the search warrant was denied. We disagree.

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; [the appellate c]ourt reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). The defendant bears the burden of demonstrating the factual predicate for his claim of ineffective assistance of counsel. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). "[A] trial court's factual findings in that regard are reviewed for clear error and cannot be disturbed unless 'the reviewing court is left with a definite and firm conviction that the trial court made a mistake.' " *Id.*, quoting *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). However, "because no *Ginther* hearing was held, our review is limited to mistakes apparent on the record." *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

The United States and Michigan Constitutions guarantee criminal defendants the right to be represented by an attorney. US Const, Am VI; Const 1963, art 1, § 20. "The constitutional right to counsel is not merely the right to have a lawyer stand or sit nearby; rather, a criminal defendant has the right to the effective assistance of counsel." *People v Otto*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362161), slip op at 4. "A defendant must meet two requirements to warrant a new trial because of the ineffective assistance of trial counsel."

---

[17] In the trial court, defendant asserted that the troopers were unable to see into the home because of the plastic coverings. Our review of the photographic exhibits supports that there were gaps that allowed one to view the home's interior.

[18] Although defendant contends that the traffic stop of Dana was pretextual, defendant fails to address standing or cite authority to challenge her traffic stop. "The right to be free from unreasonable searches and seizures is personal, and the right cannot be invoked by a third party." *People v Mahdi*, 317 Mich App 446, 458-459; 894 NW2d 732 (2016). A defendant must demonstrate standing. *Id.* at 459. Additionally, a party must adequately brief an issue for the appellate well to flow. *People v Henry*, 315 Mich Ap 130, 148-149; 889 NW2d 1 (2016). For this reason, we also reject defendant's challenge to the search of his wallet at the time of his arrest. The troopers noted that contraband, such as razor blades, could be placed in the wallet. This claim of error does not entitle defendant to appellate relief. *Id.*

*Armstrong*, 490 Mich at 289-290. To establish entitlement to relief premised on ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that, but for this deficient performance, there is a reasonable probability that the outcome would have been different. *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023). "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel." *People v Kevorkian*, 248 Mich App 373, 419; 639 NW2d 291 (2001).

To demonstrate deficient performance, "the defendant must overcome the strong presumption that counsel's assistance constituted sound trial strategy." *Armstrong*, 490 Mich at 290. That is, defense counsel is given the strong presumption that adequate assistance was rendered and all significant decisions were made in the exercise of reasonable professional judgment. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015), quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). When applying this standard, a reviewing court must affirmatively consider the scope of possible reasons counsel had to proceed in the manner that they did. *Vaughn*, 491 Mich at 670. Then, the defendant must show that, "but for counsel's deficient performance, a different result would have been reasonably probable." *Armstrong*, 490 Mich at 290.

Defendant failed to meet his burden of demonstrating ineffective assistance of counsel. Our review of the lower court record reveals that defense counsel moved to suppress or quash evidence. Sometime thereafter, defendant obtained permission to represent himself, and the trial court had standby counsel available to defendant. Indeed, standby counsel filed defendant's motion for reconsideration of the denial of the motion to quash, but noted that defendant was proceeding *in propria persona*. The reconsideration motion reflected that standby counsel's participation was limited to adding the caption, typing the document, and making typographical corrections. Indeed, at the plea proceeding, defendant initially indicated that he wished to represent himself. However, after consulting with standby counsel, he requested that the trial court appoint her to handle the plea proceeding. In the course of being apprised of his rights during the plea, the trial court expressly advised defendant that he was "giving up the right to appeal issues that would otherwise be appealable if you were convicted at a trial." And, from the conviction and sentence, the trial court expressly advised defendant that his guilty plea would not be an appeal as of right but by application for leave.

During the sentencing, defendant sought to represent himself and withdraw his plea. At this hearing, defense counsel expressed frustration that defendant refused to communicate with her because she would offer a different ground addressing the plea withdrawal. Despite only acting, at that time, as standby counsel, she advised defendant not to make certain remarks in his exchanges with the trial court. Ultimately, defendant did permit standby counsel to address his circumstances as applied to sentencing. After sentencing, the trial court did not expressly advise defendant that he was limited to an application for leave to appeal.

Thus, the record reflects that defendant chose to represent himself and refused to cooperate and communicate with standby counsel. Defendant only sought counsel's representation during

the plea-taking process and to offer mitigation at sentencing. Under these circumstances, we cannot conclude that counsel was ineffective for failing to file an interlocutory appeal. See *Kevorkian*, 248 Mich App at 419. Further, even if we were required to directly address the issue as if counsel had represented defendant at that stage of the proceedings, we would reject defendant's claim because, as already discussed, the underlying Fourth Amendment issues were meritless. *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003) ("Ineffective assistance of counsel cannot be predicated on the failure to make a . . . meritless motion.").

## IV. PLEA COERCION

Lastly, defendant alleges that his plea was coerced by the misrepresentation of Dana's plea agreement and the prosecutor's threat to rescind Dana's plea agreement when he sought to withdraw his own plea. Because the record is insufficient to address this question, we remand for a determination whether an evidentiary hearing is necessary to address the voluntariness of his plea under the circumstances.[19]

In *Samuels*, ___ Mich at ___, slip op pp 2-3, the defendant and his twin brother were involved in a fight at a restaurant. They were similarly charged with assault and weapon offenses. The prosecutor proposed a package-deal plea offer that both the defendant and his brother would plead guilty to assault with intent to commit murder and possession of a firearm during the commission of a felony. The defendant would have five other charges and the fourth-habitual offender notice dismissed, but the offer was contingent upon his brother also accepting it. The defendant objected to the plea offer and sought a trial but changed his mind because his brother wanted to accept the plea offer. The trial court accepted the pleas. At sentencing, both men moved to withdraw their guilty pleas. The defendant claimed that his plea was involuntary because it was conditional upon the "package-deal" and coercive. The trial court denied the motion, concluding that the pleas were freely, knowingly, and voluntary and did not conduct an evidentiary hearing. *Id*.

Our Supreme Court held that "a defendant may be entitled to an evidentiary hearing on the question of voluntariness where the record raises a question of fact as to whether the defendant's plea was induced by a promise of leniency to a third party."[20] *Id*. at slip op p 13. Accordingly, we remand for a determination of whether an evidentiary hearing is necessary, and if so, to proceed accordingly.

Affirmed in part and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Sima G. Patel
/s/ Thomas C. Cameron
/s/ Anica Letica

---

[19] Both defendant and Dana apparently completed their sentences.

[20] Our Supreme Court did not require a familial relationship to challenge a package-deal plea offer. Therefore, marriage between defendant and Dana was not necessary.